**SEALED**

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

SEP 0 6 2017

JULIA C. DUDLEY, CLERK
BY: /s/ J. Jones
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF A SEARCH OF: ) | Case No. 3:17-mj-00057 |
| ) | |
| INFORMATION ASSOCIATED WITH ) | **UNDER SEAL** |
| FACEBOOK USER ID ) | |
| ALEXMIACHAELRAMOS; ) | |
| MICHAELA.RAMOS.56829 THAT IS ) | |
| STORED AT PREMISES CONTROLLED ) | |
| BY FACEBOOK, INC. ) | |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
FOR A WARRANT TO SEARCH AND SEIZE**

I, Christopher Hartley, being duly sworn, depose and state as follows:

**INTRODUCTION**

1. I am a Special Agent of the United States Department of Justice, Federal Bureau of Investigation ("FBI") and have been so employed since February 2016. I am assigned to the Washington Field Office, Northern Virginia Resident Agency, located in Manassas, Virginia. My principal duties include the investigation of, among other matters, civil rights violations of the United States.

2. I am a federal law enforcement officer under applicable provisions of the United States Code under Rule 41(a) of the Federal Rules of Criminal Procedure. I have received training in and have experience in the enforcement of the laws of the United States, including the preparation and presentation of search warrants, and in executing court-ordered search warrants.

*Reviewed by Ronald M. Huber, AUSA 9-5-2017*

1

3. I make this affidavit in support of an application by the United States of America for a warrant to search and seize evidence associated with Facebook accounts: **AlexMiachaelRamos**, and **Michaela.ramos.56829** as further described in Attachment A.

4. Based on the information below, I submit there is probable cause to believe the aforementioned Facebook accounts will contain evidence, as more fully identified in Attachment B, of violations of federal law, including, but not limited to, Title 18, United States Code, Sections 245 (Federally Protected Activities), 249 (Hate Crime Acts), and 2101 (Riots).

5. Through training and experience, the Affiant has knowledge that domestic terrorists and persons affiliated with white supremacists group and/or conspirators will utilize cell phones, and other electronic devices, electronic mail ("e-mail"), and social media to conduct their illegal activity and maintain contact with other confederates, conspirators and criminal associates involved with the planning, targeting, and execution of their political or social goals to include, but not limited to, espousing bias-motivated violence.

6. The Affiant bases this affidavit upon personal knowledge and observations made during the course of this investigation, information conveyed to me by other law enforcement officers assigned to this investigation, and upon my personal review of records, documents, and items lawfully obtained by third parties. This affidavit is not intended to include each and every fact known to me or the other investigating agencies, nor does it reflect all the evidence developed during the course of the investigation. Instead, the Affiant has set forth sufficient information to establish probable cause for the issuance of the requested search warrant. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part.

## RELEVANT STATUTES

7. *Federally Protected Activities*, Title 18, United States Code, Section 245, provides that "Whoever . . . by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with…any citizen because he is or has been . . . lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in [18 U.S.C. 245(b)(1) or 245(b)(2)], or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate…" shall be guilty of a federal offense.

8. *Hate Crime Acts*, Title 18, United States Code, Section 249, provides in part that "[w]hoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person . . . " shall be guilty of a federal offense.

9. *Riots*, Title 18, United States Code, Section 2101, provides in part that "[w]hoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, . . . to incite a riot; or [ ] to organize, promote, encourage, participate in, or carry on a riot; or [ ] to commit any act of violence in furtherance of a riot, or [ ] to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot . . ." shall be guilty of a federal offense.

## JURISDICTION

10. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND

11. On August 12, 2017, a "Unite the Right" rally was held at Emancipation Park in Charlottesville, Virginia. The purpose of the planned rally was to protest the removal of the Robert E. Lee and Thomas "Stonewall" Jackson statues in Charlottesville, Virginia. Several groups espousing right-wing nationalist and/or white supremacist views attended the rally in support.

12. In addition, several thousand counter-protestors attended the rally to oppose the rally and its supporters. Throughout the day, several instances of violence occurred between protestors and counter-protestors. At approximately noon, the rally was declared an unlawful assembly by the Charlottesville Police Department, and both protestors and counter-protestors dispersed to separate locations.

## PROBABLE CAUSE
## TO BELIEVE EVIDENCE OF A CRIME EXISTS AT SUBJECT PREMISES

13. The FBI is conducting an investigation into possible violations of federal criminal law committed by ALEX MICHAEL RAMOS ("RAMOS") and other individuals allegedly associated with white supremacists groups. The investigation was initiated following receipt of information RAMOS and other individuals, physically attacked an African-American male counter-protestor (the "VICTIM") who suffered bodily injuries as a result of the attack.

4

14. The VICTIM described the attack in the following GoFundMe[1] posting entitled "I Was Beaten By White Supremacists": "I arrived at Emancipation Park around 11 AM as a counter-protester to voice my opinion on racial tensions and to literally stand up for what I believe in. I was only there for a few minutes before I was hit with water bottles, maced with pepper spray, and had derog[atory] slurs hurled at me… I was brutally attacked by white supremacists in the parking garage right beside the Charlottesville Police Station. I was chased and beat[en] with metal poles. I was knocked unconscious repeatedly. Every time I went to stand up I was knocked back down…My injuries were too extensive to be treated at the scene so I was taken to the ER at Martha Jefferson Hospital. I was diagn[os]ed with a concussion, an ulnar fracture, and had to receive eight staples in my head."

15. In an interview with the FBI, the VICTIM stated he, the VICTIM, was taken to a medical tent in McIntire Park where the VICTIM was triaged and then transported to Martha Jefferson Hospital. At the hospital, a doctor diagnosed the VICTIM with a concussion, treated a laceration on the VICTIM's head with staples, x-rayed the VICTIM's arm, administered a tetanus shot, and splinted the VICTIM's left wrist with a follow-up plan to receive a cast. The VICTIM left the hospital and went to his home in Charlottesville at approximately 2:00 P.M. on August 12, 2017.

16. Video and images of the assault on the VICTIM have been published online. The video and images were circulated on online social media platforms including Twitter and Facebook as well as various websites. *See* Matthew Barakat, "Man beaten at protest says police were indifferent to attack," *Washington Post* (August 15, 2017) (noting that "[p]hotos and video of the beating inflicted on 21-year old [VICTIM] have gone viral").

---

[1] GoFundMe is an online platform allowing individuals to raise money for events ranging from life events such as celebrations and graduations to challenging circumstances like accidents and illnesses.

5

17. RAMOS is allegedly depicted in the aforementioned videos and images as a white male, with long dark hair, a beard and wearing a red hat that reads in front "Make America Great Again" in white letters.

18. On August 16, 2017, the FBI received information from individuals who contacted the FBI Public Access Line to identify BORDEN and RAMOS as the attackers in the aforementioned attack incident. Through public information and open source research, the FBI confirmed **Michaela.ramos.56829** and **AlexMiachaelRamos** are Facebook accounts associated with RAMOS. The FBI received the following images allegedly depicting RAMOS at the "Unite the Right" rally from RAMOS' Facebook and Twitter profiles:



The above image depicts a white male, allegedly RAMOS, in the lower right, wearing a red hat, white tank top, blue jeans, and red shoes attacking the VICTIM in a parking garage.

6

19. The image below depicts a "Michael A. Ramos" stating "We stomped ass, I really didn't want CNN showing this but, getting sum was Fucking fun! VICTORY!!!" The image was allegedly taken from RAMOS' Facebook profile.



The second set of images depict a white male, believed to be RAMOS, holding a confederate flag.

7

20. Through open source research the FBI found the below image allegedly depicting RAMOS, prior to the parking garage attack, walking with a shirt wrapped around his hand and wrist.



21. In addition, further open source research found a screenshot of a video depicting the parking garage attack. The video screen shot below allegedly depicts RAMOS striking the VICTIM with the same hand wrapped in a shirt as depicted in the previous image.



8

22. RAMOS livestreamed a video statement using the Facebook Live video service associated with his Facebook account shortly after the assault on VICTIM. During that video, which was preserved by multiple websites, RAMOS confirmed that he was involved in the assault on VICTIM but stated that his actions were taken in self-defense or in the defense of others.

23. RAMOS made similar statements to the media before turning himself into the authorities in Georgia on state charges brought in the Commonwealth of Virginia.

24. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

25. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

26. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account

9

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

27. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

28. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

29. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the

photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

30. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

31. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

32. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

33. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

34. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the

11

account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

35. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

36. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

37. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

38. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

39. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

40. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

41. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

42. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

13

43. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.

44. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to

14

commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

45. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## CONCLUSION

46. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Facebook who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Christopher J. Hartley
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this 6th of September, 2017.

Honorable Joel C. Hoppe
United States Magistrate Judge

15